# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW MEXICO

**UNITED STATES**,
    Plaintiff,

vs.
                                                 No. 17-CR-1231 JAP

**FABIAN I. SANCHEZ**,
    Defendant.

## MEMORANDUM OPINION AND ORDER

On May 19, 2017, a Grand Jury indicted Defendant Fabian I. Sanchez ("Defendant") for knowingly possessing a firearm after previously being convicted of a felony crime in violation of 18 U.S.C. §922(g)(1). The indictment arose out of an encounter between Rio Rancho Police Department and Defendant, which culminated in Defendant's arrest. On January 11, 2018, the Government filed a motion in limine seeking to admit certain statements made during the course of the encounter.[1] The Government amended the motion in limine on May 18, 2018.[2] On April 25, 2018, Defendant filed a motion to suppress all physical evidence and all statements arising from and pertaining to his arrest.[3] The Government responded on May 9, 2018,[4] and Defendant replied on May 25, 2018.[5]

On June 18 and June 19, 2018, the Court held an evidentiary hearing on the Government's and Defendant's motions. Defendant was present with his counsel Assistant Federal Public Defender Sylvia Baiz. Assistant United States Attorneys Nicki Tapia-Brito and

---

[1] *See* GOVERNMENT'S MOTION IN LIMINE TO ADMIT DEFENDANT'S STATEMENTS (Doc. 18).
[2] *See* GOVERNMENT'S AMENDED MOTION IN LIMINE TO ADMIT DEFENDANT'S STATEMENTS AND RULE 404(B) NOTICE (Doc. 39) ("Motion to Admit Statements").
[3] *See* MOTION TO SUPPRESS EVIDENCE DUE TO VIOLATION OF THE FOURTH AMENDMENT (Doc. 27) ("Motion to Suppress").
[4] *See* UNITED STATES RESPONSE TO DEFENDANT'S MOTION TO SUPPRESS EVIDENCE (Doc. 35).
[5] *See* REPLY TO GOVERNMENT'S RESPONSE TO MOTION TO SUPPRESS EVIDENCE DUE TO VIOLATION OF THE FOURTH AMENDMENT (Doc. 44).

Eva Fontanez appeared for the Government. The Court requested additional briefing on issues presented at the hearing.[6] After considering the parties' written submissions, the exhibits, the testimony, and the arguments of counsel, the Court will deny Defendant's Motion to Suppress and will grant the Government's Motion to Admit Statements.

## I. FACTUAL BACKGROUND

On June 18 and June 19, 2018, at an evidentiary hearing on Defendant's Motion to Suppress, the Court heard the testimony of Officer Aaron Brown[7] and Officer Alexander Cordova (hereinafter, when referred to jointly, "Officers") of the Rio Rancho Police Department ("RRPD"). The Court found the Officers to be credible. During the hearing, the Court reviewed exhibits presented by the Government and by Defendant. Based on the testimony of Officer Aaron Brown and Officer Alex Cordova, and the Court's review of the exhibits, the Court makes the following factual findings:

On November 30, 2016, at approximately 4:15 p.m. RRPD issued a Be On the Look Out ("BOLO") report for a silver Hyundai, license plate number NWX956, that had been stolen in the Rio Rancho area. That evening, because Officer Brown knew that stolen cars were often kept in motel or hotel parking lots, Officer Brown patrolled the parking lot at Extended Stay America. He was in plain clothes and drove an unmarked vehicle equipped with lights and a siren.

Office Brown saw a tan colored Hyundai, license number NXZ755 parked at an odd angle with its wheels across the white lines demarking a parking space. The way the Hyundai was parked coupled with the BOLO concerning a stolen Hyundai made Officer Brown suspicious. Officer Brown ran the Hyundai's license plate number and it returned to a gold 2005

---

[6] *See* United States' Additional Briefing (Doc. 51); Fabian Sanchez's Supplemental Briefing (Doc. 52).
[7] In November 2016, Aaron Brown was an officer with the RRPD. Since then, he has received a promotion to Detective. For consistency, throughout this Memorandum Opinion and Order, the Court will refer to him as Officer Brown as that was his position during the events under consideration here.

Hyundai. Office Brown believed the Hyundai in the parking lot to be a newer model. He then approached the Hyundai to obtain the last four digits of the Hyundai's vehicle identification number ("VIN"), which he relayed to dispatch.

Per RRPD policy, Officer Brown requested additional assistance. RRPD Officer Alex Cordova responded to Officer Brown's request. Wearing plain clothes, Officer Cordova arrived in an unmarked vehicle equipped with sirens and lights. He parked at a diagonal to the Hyundai in an adjacent space.

Dispatch informed Officer Brown that the last four digits of the VIN did not match the information on the Hyundai's license plate. Following RRPD policy, Officer Brown started to obtain the full VIN to give to dispatch. However, before Officer Brown exited his car to get the complete VIN, Defendant, Fabian Sanchez, arrived in the parking lot in a gold Lexus SUV. Defendant backed the Lexus into the parking space next to the driver's side of the Hyundai. Officer Cordova had parked his vehicle on the passenger side of the Hyundai. Both RRPD officers, who were seated in their cars, could see Defendant and watched him as he got out of the Lexus. Defendant left open the driver's side door, which partially obscured the area between the Hyundai and the Lexus. The Officers observed that Defendant wore a black trench style coat ("trench coat'). Defendant went to the back of the Lexus and retrieved a toolbox. Defendant then crouched between the two vehicles at a place where the open door of the Lexus partially shielded Defendant from view. Officer Brown believed Defendant was preparing to tamper with the Hyundai.

Officers Brown and Cordova approached the Hyundai to get its complete VIN. Officer Brown wore soft body armor with the word "Police" on the chest. Officer Cordova put on a tactical vest, which was marked clearly on the front and back with the word "Police." As the

Officers got close to the Hyundai, Defendant rose from between the two vehicles. Defendant held the toolbox in one hand and appeared surprised to see the two officers. Both Officers announced themselves as police. For officer safety reasons, they asked Defendant to drop the toolbox, which he did.

Officer Brown asked Defendant what he was doing. Defendant stated that the Hyundai was his girlfriend's car and that he was working on it. Officer Brown asked Defendant about the Lexus. Defendant denied stepping out of the Lexus and stated that the Lexus was not his. Officer Brown told Defendant that the officers had witnessed him exiting the Lexus. Defendant continued to deny any association with the Lexus.

Officer Brown noticed Defendant moving his hands near his trench coat pockets. Defendant's behavior caused Officer Brown to have safety concerns because, based on Officer Brown's training and experience, he believed Defendant's behavior was consistent with someone who might have a weapon. Officer Brown ordered Defendant to show his hands and then place his hands on his head for a weapons pat down. At that moment, based on their training and experience, both Officers thought Defendant looked as though he was going to run.

Defendant stated, "I didn't do nothing" and then ran from the Officers east through the hotel parking lot. Both Officers commanded him to stop. Both Officer Brown and Officer Cordova saw Defendant reach into his coat pocket with his right hand. Defendant appeared to have some difficulty getting his hand in his pocket. Defendant looked back toward the Officers. The Officers became concerned for their safety. Officer Cordova deployed his department-issued taser.[8] One of the taser's two capsules hit Defendant in the back of his trench coat. The trench coat appeared to interfere with the effectiveness of the taser. The other capsule did not deploy.

---

[8] Officer Brown and Officer Cordova testified somewhat differently about the use of the taser. Officer Brown testified that he told Officer Cordova to use it, and Officer Cordova testified that he made the decision to deploy it

Defendant contracted his shoulder muscles but appeared otherwise unaffected by the

taser. He continued to flee. While running, he shrugged off his trench coat. Then, he changed

directions and ran back toward the Lexis and the Hyundai. Officer Brown intercepted Defendant.

Defendant was then taken to the ground.[9] Officer Cordova handcuffed Defendant.

Officer Brown went to the area where Defendant had discarded his trench coat. Officer

Brown lifted the trench coat and noted it was heavier on one side. He examined the trench coat's

pockets. He found a small, silver Jimenez Arm Inc., model J.A. 380 caliber firearm in a cloth

holster.

For officer safety reasons, Officer Brown told Officer Cordova that there was a gun.

Defendant exclaimed, "That's why I ran."

Later, the Officers discovered that the handgun was loaded with five rounds of .380

ammunition, and one round was fully chambered.

## II. DISCUSSION

Two motions are before the Court: Defendant's Motion to Suppress and the

Government's Motion to Admit Statements. Defendant's Motion to Suppress alleges that upon

Defendant's first encounter with the Officers, the Officers seized Defendant without probable

cause in violation of his Fourth Amendment rights. Alternatively, Defendant argues that Officer

Brown violated his Fourth Amendment rights because when Officer Brown searched

Defendant's trench coat, Officer Brown did not have probable cause or a warrant to do so. In the

Government's Motion to Admit Statements, the Government seeks to admit several statements

made by Defendant that Defendant argues Officer Brown elicited in violation of his Fifth

---

and did not receive any instructions from Officer Brown. The Court finds this discrepancy immaterial because the decision to deploy the taser is not relevant to any issues currently before the Court.

[9] There was conflicting testimony about which Officer stopped Defendant. However, it is clear from the evidence that one of the Officers stopped Defendant, and that Officer Cordova handcuffed Defendant.

Amendment rights. The Court finds that Officer Brown and Officer Cordova did not violate

Defendant's Fourth or Fifth Amendment rights and that all physical evidence and Defendant's

statements are admissible.

## A. Seizure of Defendant

The Fourth Amendment protects individuals from "unreasonable searches and seizures."

U.S. Const. amend. IV. The Tenth Circuit recognizes three types of encounters between police

and citizens: 1) consensual encounters; (2) investigative detentions; and (3) arrests. *United States*

*v. Hammond*, 890 F.3d 901, 904 (10th Cir. 2018). Because consensual encounters occur as an

agreed interaction between police and citizens, consensual encounters do not "'implicate the

Fourth Amendment.'" *Id.* (quoting *United States v. Davis*, 94 F.3d 1465, 1467-68 (10th Cir.

1996). Investigative detentions "'are Fourth Amendment seizures of limited scope and duration

and must be supported by a reasonable suspicion of criminal activity.'" *Id*.  Arrests are "'the

most intrusive of Fourth Amendment seizures and reasonable only if supported by probable

cause.'" *Id.*

In differentiating between the types of encounters, a court must examine whether law

enforcement has seized a citizen. A seizure occurs when law enforcement "by means of physical

force or show of authority, has in some way restrained the liberty of a citizen." *Terry v. Ohio*,

392 U.S. 1, 19 n.16 (1968). "When an officer does not apply physical force to restrain a subject,

a Fourth Amendment seizure occurs only if (a) the officer shows his authority; and (b) the citizen

'submits to the assertion of authority.'" *United States v. Salazar*, 609 F.3d 1059, 1064 (10th Cir.

2010) (quoting *California v. Hodari D*., 499 U.S. 621, 625-26 (1991)). Law enforcement

engages in a show of authority when "in view of all of the circumstances surrounding the

incident, a reasonable person would have believed that he was not free to leave." *United States v.*

*Mendenhall*, 446 U.S. 544, 554 (1980). However, a show of authority is not enough to establish a

seizure unless it is accompanied by an individual's actual submission. *Brendlin v. California*,

551 U.S. 249, 254 (2007); *United States v. Roberson*, 864 F.3d 1118, 1121-22 (10th Cir. 2017).

"Submission 'requires, at minimum, that a suspect manifest compliance with police orders.'"

*Roberson*, 864 F.3d at 1122 (quoting *United States v. Mosley*, 743 F.3d 1317, 1326 (10th Cir.

2014)).

In his Motion to Suppress, Defendant argues that, from the inception of their encounter,

Officer Brown and Officer Cordova seized him. Specifically, Defendant contends that seizure

occurred at three times: 1) when Officer Brown and Officer Cordova approached him in the

parking lot; 2) when Officer Brown told him they were going to do a protective pat down for

weapons; and 3) when Officer Cordova tased him.

### 1. Initial Encounter with Defendant

Defendant argues that when Officer Brown and Officer Cordova first approached him in

the parking lot, they unconstitutionally seized him because they had no reason to believe that he

was involved in criminal activity. The Government responds that at its inception the encounter

between the Officers and Defendant was consensual and did not implicate the Fourth

Amendment. The Court agrees.

The Supreme Court has clarified "that a seizure does not occur simply because a police

officer approaches an individual and asks a few questions." *Florida v. Bostick*, 501 U.S. 429, 434

(1991). In addition to asking questions, law enforcement also may look at the individual's

identification, may ask to search an individual's luggage, and may actually search personal

belongings "as long as the police do not convey a message that compliance with their requests is

required." *Id.* "Unless the circumstances of the encounter are so intimidating as to demonstrate

that a reasonable person would have believed he was not free to leave if he had not responded, one cannot say that the questioning resulted in a detention under the Fourth Amendment." *I.N.S. v. Delgado*, 466 U.S. 210, 216 (1984) (citations omitted). This is an objective test that focuses on what a reasonable innocent person would believe in the particular factual circumstances.

Here, Officer Brown and Officer Cordova approached Defendant to ask him some questions. When they inquired about the Hyundai and the Lexus, they did not engage in any behavior indicating that Defendant was not free to leave. Defendant argues that the act of asking questions initiates an investigation that law enforcement must support with reasonable suspicion. This argument seems to rely on the premise that when a police officer asks questions, an individual is compelled to answer them. However, that is not the law. The act of asking questions, standing alone does not constitute a seizure. Defendant's argument focuses on his subjective beliefs, not on the objective beliefs of a reasonable innocent person. His subjective beliefs do not elevate his initial encounter with Officer Brown and Officer Cordova to a seizure. At its inception, the encounter was consensual.

### 2. Investigative Detention Based on Reasonable Suspicion

Defendant argues that even if the Officers' initial questions did not constitute a seizure, a seizure occurred later in the encounter. The Government does not debate that point. Instead, it argues that the initial consensual encounter became an investigative stop supported by reasonable suspicion. The facts and circumstances as they developed during the initial consensual encounter between the Officers and Defendant support the Government's argument.

"[I]f there are articulable facts supporting a reasonable suspicion that a person has committed a criminal offense, that person may be stopped in order to identify him, to question him briefly, or to detain him briefly while attempting to obtain additional information." *Hayes v.*

*Florida*, 470 U.S. 811, 816 (1985). Several facts supported the Officers' reasonable suspicion. First, Defendant drove up in a Lexus, but then denied doing so and denied any association with the Lexus. Second, Defendant removed a toolbox from the Lexus and went to the Hyundai. The Officers testified that based on their experience, the toolbox made them suspicious that Defendant intended to "punch the locks" or break into the Hyundai. Third, Defendant stated that the Hyundai belonged to his girlfriend. At this point, the Officers were aware that the Hyundai bore a license plate that did not match the final four digits of its VIN, which was an indication that the license plate had not been assigned to that Hyundai. Finally, both the Hyundai and the Lexus were in the back area of an Extended Stay America, which was often used as a repository for stolen cars. The combination of these factors gave the Officers reasonable suspicion that Defendant was involved in criminal activity.

Defendant argues that the totality of the circumstances did not support reasonable suspicion. He contends further that even if the Officers did have reasonable suspicion, they went beyond the parameters of a brief investigative detention when the Officers asked him to put his hands on his head for a protective pat down. Alternatively, he argues that the law mandates that law enforcement have probable cause before conducting a protective pat down.

An officer may pat down an individual without violating that individual's Fourth Amendment rights "upon reasonable suspicion that [he] may be armed and dangerous." *Arizona v. Johnson*, 555 U.S. 323, 332 (2009) (quoting *Knowles v. Iowa*, 525 U.S. 113, 117-118 (1998)). When an officer possesses a reasonable suspicion, the officer is permitted to "'conduct a carefully limited search of the [suspect's] outer clothing …in an attempt to discover weapons which might be used to assault him.'" *Hammond*, 890 F.3d at 906 (quoting *Terry*, 392 U.S. at 30). "While reasonable suspicion cannot be based upon a 'mere hunch,' it also 'need not rise to

the level required for probable cause, and it falls considerably short of satisfying a preponderance of the evidence standard." *United States v. Davis*, 636 F.3d 1281, 1291 (10th Cir. 2011) (quoting *United States v. Arvizu*, 534 U.S. 266, 274 (2002). In assessing the reasonableness of an officer's suspicion that a suspect is armed and dangerous, the Tenth Circuit indicates that a court must examine the totality of the circumstances. *Hammond*, 890 F.3d at 906.

Here, Defendant kept putting his hands near his trench coat pockets. The Officers suspected that he might have a gun and became concerned about their welfare. The encounter occurred in a dark, secluded area behind the hotel. No one other than the Officers and Defendant was in the area. Defendant wore a trench coat and moved his hands in a way that, based on the Officers' training and experience, indicated Defendant might have a weapon. The totality of the circumstances supports the Officers' decision to conduct the pat down.

However, even if the Officers lacked reasonable suspicion to conduct a pat down, the Officers did not violate Defendant's Fourth Amendment rights because Defendant never permitted them to do a pat down. A seizure occurs only when a police officer makes a show of authority, and a defendant demonstrates actual submission to authority. An individual submits to authority when he "'manifest[s] compliance with police orders.'" *United States v. Martin*, 613 F.3d 1295, 1300 (10th Cir. 2010) (quoting *Salazar*, 609 F.3d at 1066). When Officer Brown ordered Defendant to submit to a pat down, Officer Brown engaged in a show of authority, because his request was one that would have restricted Defendant's movements. However, Defendant never demonstrated actual submission to that authority because he fled. At that point, the Officers had not seized Defendant.

### 3.    Arrest of Defendant

Defendant next argues that the Officers had no probable cause to arrest him. "Probable cause exists if facts and circumstances within the arresting officer's knowledge and of which he or she has reasonable trustworthy information are sufficient to lead a prudent person to believe that the arrestee has committed or is committing an offense" *Keylon v. City of Albuquerque*, 535 F.3d 1210, 1216 (10th Cir. 2018) (quoting *Romero v. Fay*, 45 F.23d 1472, 1476 (10th Cir. 1995)). When Officer Brown asked Defendant to submit to a protective pat down, Defendant ran. New Mexico law prohibits fleeing from the police under these circumstances. N.M. Stat. Ann. §30-22-1(B);[10] se*e also New Mexico v. Jimenez*, 392 P.3d 668, 679 (2017). Because Officer Brown and Officer Cordova witnessed Defendant violating New Mexico state law, they had probable cause to arrest him. Even if Defendant's attempt to flee did not violate New Mexico law, by this point in the encounter the Officer's reasonable suspicion of criminal behavior accompanied by Defendant's decision to flee gave the Officer's probable cause to arrest him, or at a minimum to detain him for further investigation.

### 4.    Alleged Use of Excessive Force

Finally, Defendant argues that when the Officers tased him, they used excessive force thereby violating his constitutional rights. "[A]ll claims that law enforcement officers have used excessive force—deadly or not—in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness standard,' rather than under a 'substantive due process' approach." *Graham v. Connor*, 490 U.S.

---

[10] Resisting, evading or obstructing an officer consists of: … B. intentionally fleeing, attempting to evade or evading an officer of this state when the person committing the act of fleeing, attempting to evade or evasion has knowledge that the officer is attempting to apprehend or arrest him[.] … Whoever commits resisting, evading or obstructing an officer is guilty of a misdemeanor. N.M. Stat. Ann. § 30-22-1(B).

386, 395 (1989). The question is whether a law enforcement officer's actions were "objectively reasonable." *Id* at 397. Reasonableness requires a balancing of the factors, which include, "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Thomson v. Salt Lake City,* 584 F.3d 1304, 1313 (10th Cir. 2009) (quoting *Graham*, 490 U.S. at 396). In assessing the reasonableness of the force, courts must acknowledge that an "'officer may be forced to make split-second judgments in certain difficult circumstances.'" *Marquez v. City of Albuquerque*, 399 F.3d 1216, 1220 (10th Cir. 2005) (quoting *Olsen v. Layton Hills Mall*, 312 F.3d 1304, 1314 (10th Cir. 2002) (further citations omitted)).

A defendant's allegation that an officer has used excessive force is a claim that law enforcement personnel used excessive force to restrain him. The Tenth Circuit has held that until a fleeing suspect is actually detained, he has not been seized because the suspect has not submitted to an officer's lawful authority. *Farrell,* 878 F.3d at 937 (10th Cir. 2017) (use of deadly force by shooting at a departing van was not excessive force because there was no seizure). "Without a seizure, there can be no claim for excessive use of force." *See Jones v. Norton*, 809 F.3d 564, 575 (10th Cir. 2015) (no seizure when defendant did not submit to officer's show of authority).

Here, Defendant was not seized when the officers attempted a pat down, because he fled. Similarly, Defendant was not seized when Officer Cordova tased him because the taser did not stop him and he continued to flee. Defendant argues that the Court must apply a higher standard because the use of a taser constitutes the use of deadly force. But, the Tenth Circuit has rejected the proposition that use of deadly force without a defendant's submission implicates a higher standard. *See Brooks v. Gaenzie*, 614 F.3d 1213, 1219 (10th Cir. 2010). In *Brooks*, the Tenth

Circuit held that shooting and hitting a defendant with a bullet is not excessive force when the defendant does not submit to that force but remains at large. And, more on point with the circumstances here, in *Hinton v. City of Elwood*, 997 F.2d 774, 777 (10th Cir. 1993), the Tenth Circuit found that the use of an electric stun gun against a man actively resisting arrest was not a use of excessive force.

**B. Search of Defendant's Jacket**

Defendant argues that the search of his trench coat was unconstitutional because the Officers did not have a warrant to search it, and the trench coat was not within his immediate control. The Government counters that the Officers did not need a warrant to search the trench coat because Defendant voluntarily abandoned it. In opposition, Defendant argues that he did not voluntarily abandon his trench coat but retained a privacy interest in it.

The Fourth Amendment does not prohibit a search of abandoned property. *United States v. Ruiz*, 664 F.3d 833, 841 (10th Cir. 2012). A person has abandoned property when the person discards it during a period of non-seizure. *California v. Hodari D.*, 499 U.S. 622, 623-24 (1991). The inquiry concerning whether property has been abandoned contains both a subjective and an objective component focusing on what the individual intended. *United States v. Garzon*, 119 F.3d 1446, 1449 (10th Cir. 1997). The objective component, which is a question of law, asks whether the individual has retained a reasonable expectation of privacy in the property. *Id.* The subjective component is a question of fact, which examines that individual's intent. *Id.* "The abandonment must be voluntary." *United States v. Hernandez*, 7 F.3d 944, 947 (10th Cir. 1993) (citations omitted). The United States has the burden to establish abandonment by a preponderance of the evidence. *United States v. Denny*, 441 F.3d 1220, 1226 (10th Cir. 2006). Under these standards, the Court can find that Defendant abandoned the trench coat if he

demonstrated his intent to relinquish any right to the trench coat or if his expectation of privacy was no longer objectively reasonable.

Generally, the Tenth Circuit has found that a defendant relinquishes a privacy right in a piece of property when a defendant purposefully leaves the item in a public place. *See, e.g., United States v. Juszczyk*, 844 F.3d 1213, 1214-15 (10th Cir. 2017) (defendant who threw a backpack on a roof relinquished his right of privacy in the backpack thereby abandoning it); *United States v. Morgan*, 936 F.2d 1561, 1570-71 (10th Cir. 2017) (defendant who threw a bag on the porch of a house owned by someone he was accompanying relinquished his right of privacy in the bag and so abandoned the bag). Here, Defendant removed his trench coat while fleeing from the Officers and dropped it in a parking lot of an Extended Stay America. A hotel parking lot is a public area. When he dropped his trench coat in the parking lot, Defendant relinquished a reasonable privacy interest in it.

Defendant next contends that he could not have abandoned the trench coat because it was still within his control and he intended to retrieve it. This argument is unsupported by law. The issue is not whether he intended to retrieve it, but whether he retained a reasonable privacy interest in the trench coat after dropping it. *See Juszczyk*, 844 F.3d at 1215.

Defendant counters that he did not abandon his trench coat voluntarily, but that the abandonment was involuntary because the officers unconstitutionally used excessive force when apprehending Defendant. Police pursuit does not make abandonment involuntary. *Id.* However, abandonment may be involuntarily if it is the result of a Fourth Amendment violation. *United States v. King*, 990 F.2sd 1552, 1564 (10th Cir. 1993). According to Defendant, the taser was an unconstitutional use of excessive force that caused Defendant involuntarily to abandon his trench coat. That argument has no legal support. There can be no use of excessive force if the actual

force used does not result in the detainment of Defendant. Here, the taser did not stop Defendant so its use was not unconstitutional.

Defendant argues that even if the taser was not a use of excessive force, the taser caused him involuntarily to abandon its coat. The evidence does not support this argument. At the hearing, both Officers testified that the taser did not actually function as it was intended. Both Officers explained that a taser works by sending two capsules or prongs into an individual. When both capsules deploy they create an electronic arc that stuns an individual. Here, only one capsule deployed and the other did not. The Officers testified that because only one taser capsule deployed, the Officers believed the taser did not stun Defendant. The evidence supports their testimony. Defendant did not testify about the reason he shed his trench coat, and he presented no evidence that contradicted the Officers' testimony.

The Court finds that Defendant subjectively intended to drop his trench coat and voluntarily did so. Because Defendant voluntarily dropped his trench coat in a public place, he abandoned it. Officer Brown could not and did not violate Defendant's privacy rights when he searched the trench coat without a warrant.

## C.    Admission of Defendant's Statements

The Government's Motion to Admit seeks to admit into evidence these statements:

(1)    Defendant's assertions that i) his girlfriend owned the Hyundai; ii) he was working on the Hyundai; and iii) he did not step out of the Lexus;
(2)    Officer Brown's statement that a gun was in the trench coat; and
(3)    Defendant's exclamation "That's why I ran."

The Government argues that all statements are relevant and are substantially more probative than prejudicial.[11]

---

[11] "The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Civ. P. 403.

The Government seeks to admit the statements described in paragraphs (1) and (2) as non-hearsay "res gestae" or as assertions that provide context for the events. Statements that provide context must be meaningful, must not overwhelm legitimate statements, and must not be unduly prejudicial. *United States v. Collins*, 575 F.3d 1069, 1073-74 (10th Cir. 2009); *see also United States v. Arellano*, ---F.Supp.3d, 2018 WL 2470949 *8. The Court agrees that Defendant's statements in paragraph (1) and Officer Brown's statement in paragraph (2) are relevant context evidence.

Defendant's paragraph (1) statements are relevant because they provide the basis for the Officers' investigation of Defendant. Moreover, the probative value of Defendant's assertions in paragraph (1) is not outweighed by their prejudicial nature. Officer Brown's statement in paragraph (2) is also relevant and not unduly prejudicial. His observation that a gun was in the trench coat is particularly relevant if Defendant's exclamation in paragraph (3), "That's why I ran[,]" is admissible because it was in response to Officer Brown's statement.

Defendant argues that his statement "That's why I ran" is inadmissible for three reasons. First, Defendant contends that Officer Brown elicited his exclamation in violation of Defendant's Fifth Amendment rights because the situation had become a custodial interrogation, and Officer Brown did not give Defendant *Miranda* warnings. Next, Defendant argues that the exclamation is the fruit of the poisoness tree because it was made during an illegal arrest. Finally, while Defendant agrees that his statement "That's why I ran" may be admissible as non-hearsay admission by a party-opponent, Defendant asserts that under Fed. R. Evid 403, the statement is substantially more prejudicial than probative.

## 1.    Defendant's Exclamation Not Made in a Custodial Interrogation

The Fifth Amendment guarantees the right of an accused to avoid self-incrimination. U.S. Const. amend. V. An individual in custody "must be warned prior to any questioning that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires." *Miranda v. Arizona*, 384 U.S. 436, 479 (1966). "Miranda rights need only be given to a suspect at the moment that suspect is 'in custody' and the questioning meets the legal definition of 'interrogation.'" *United States v. Chee*, 514 F.3d 1106, 1112 (10th Cir. 2008) (quoting *United States v. Perdue*, 8 F.3d 1455, 1463 (10th Cir. 1993)). Interrogation includes not only express questioning, but also "any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *United States v. Yepa*, 862 F.3d 1252, 1257 (10th Cir. 2017) (quoting *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980)).

Defendant contends that his exclamation "That's why I ran" is inadmissible because at that time, he was in custody and he had not yet received his *Miranda* warnings. Essentially, Defendant posits that Officer Brown's statement that there was a gun in the trench coat was, in effect, custodial questioning. The Government argues that although Defendant was in custody, he said "That's why I ran" voluntarily and not as the result of any coercive police conduct.

The Tenth Circuit has directed courts to use an objective test to examine whether law enforcement statements are custodial questioning. This test "'focuses on the perceptions of a reasonable person in the suspect's position rather than the intent of the investigating officer.'" *Yepa*, 862 F.3d at 1257 (quoting *United States v. Cash*, 733 F.3d 1264, 1277 (10th Cir. 2013).

"Any statement given freely and voluntarily without any compelling influences is, of course, admissible in evidence." *Miranda*, 384 U.S. at 478.

When Officer Brown picked up the trench coat, he noticed it was heavy and found a gun in the pocket. Officer Brown's statement was one of objective fact; it was not interrogative. Officer Brown testified that he made the statement to warn Officer Cordova, who had just taken Defendant into custody, that there might be additional weapons. Officer Brown's testimony was credible. The Court finds that a reasonable person would not have believed that Officer Brown's statement was a question mandating a response. Defendant's exclamation was a spontaneous reaction to Officer Brown's statement that he found a gun and was not the product of a custodial interrogation.

Next, Defendant asserts that any statement made by him while in custody in response to a statement made by police officers is a per se violation of his Fifth Amendment rights because the standard operation procedures ("SOP") of the RRPD forbid any discussion between officers until a Defendant has been Mirandized. Defendant appears to be arguing that because the RRPD SOP prohibits such discussion, any verbal communication between officers could only be for the purpose of eliciting incriminating statements. The Government counters that the RRPD SOP disallows only a discussion designed to provoke a defendant to speak; therefore, the intent of an officer is relevant to the inquiry.

The RRPD SOP provides:

> If the arrestee has not waived his or her Miranda rights, and even though the arrestee is not directly questioned by MOS, they shall refrain from engaging in conversation among themselves in the presence of the arrestee that is calculated to elicit incriminating statements or admissions from the arrestee.

United States Additional Briefing (Doc. 51), p. 13 (citing Rio Rancho Police Department, Standards and Procedures, Sec IX, chapter 2, Art 1, §P(6), effective March 22, 2004, revised

January 1, 2008). The language "calculated to elicit" requires deliberate intent. Only if Officer

Brown declared that he had found a gun intending to elicit an incriminating response from

Defendant, would he violate the RRPD SOP. The Court finds that officer safety concerns

motivated Officer Brown's statement and Officer Brown did not engage in conversation with

Officer Cordova in a calculated effort to elicit incriminating statements or admissions from

Defendant.

### 2.    Defendant's Exclamation Not the Product of Illegal Arrest

As to Defendant's second reason for excluding his statement "That's why I ran"—that it

is the fruit of an illegal arrest—Defendant's argument fails. By the time Defendant uttered the

exclamation, the Officers had probable cause to lawfully arrest Defendant. Consequently,

Defendant's statement is not the product of a violation of his constitutional rights.

### 3.    Defendant's Exclamation Admissible Under Rule 403

After acknowledging that his exclamation "That's why I ran" may be admissible under

Rule 801(d)(2)[12] as a statement of a party opponent, Defendant argues "that the statement is

more prejudicial than probative and that it should be excluded after a balancing of factors under

Rule 403." RESPONSE TO GOVERNMENT'S AMENDED MOTION IN LIMINE (Doc. 45) at

3. Defendant did not suggest how the Rule 403 factors, which he did not identify, should be

balanced. In other words, Defendant did not develop his Rule 403 argument.

First, the Court rules that Defendant's exclamation "That's why I ran" is admissible

under Rule 801(d)(2)(A) as a statement made by an opposing party that is not hearsay. Next,

under Rule 403, the Court concludes that the danger of unfair prejudice does not substantially

outweigh the probative value of Defendant's statement. The exclamation is highly probative of

---

[12] "A statement that meets the following conditions is not hearsay: … (2) … The statement is offered against an opposing party and: (A) was made by the party in an individual or representative capacity[.]" Fed. R. Evid. 801(d)(2)(A).

Defendant's knowledge that he possessed a gun. The exclamation contains no inflammatory or threatening language, and does not contain expletives or other offensive terms that present a danger of unduly prejudicing a jury against Defendant. Thus, Rule 403 does not require the exclusion of Defendant's exclamation.

IT IS ORDERED that Defendant's Motion to Suppress (Doc. 27) is DENIED and the Government's Motion to Admit Statements (Doc. 39) is GRANTED.

_____
**SENIOR DISTRICT COURT JUDGE**